# United States Court of Appeals
## For the First Circuit

No. 25-1781

RHODE ISLAND TRUCK CENTER, LLC,

Plaintiff, Appellant,

v.

DAIMLER TRUCKS NORTH AMERICA, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Melissa R. DuBose, U.S. District Judge]

Before

Montecalvo, Lynch, and Dunlap,
Circuit Judges.

Edward J. Sackman, with whom Hilary Holmes Rheaume, Bernstein, Shur, Sawyer & Nelson, P.A., Samira Omerovic, and Omerovic Legal, PLLC, were on brief, for appellant.
Nathan D. Imfeld, with whom Natalie F. Pike, Foley & Lardner LLP, Daniel E. Burgoyne, and Partridge, Snow, & Hahn LLP, were on brief, for appellee.

July 17, 2026

**DUNLAP**, **Circuit Judge**. This dispute arises from the Dealer Agreement between Rhode Island Truck Center, LLC ("RITC"), a truck dealership, and Daimler Trucks North America, LLC ("Daimler"), a truck manufacturer that markets and sells trucks in North America. The Dealer Agreement allowed RITC to sell Daimler's Freightliner brand of trucks in a designated Area of Responsibility ("AOR"). It also allowed Daimler to add new dealers to RITC's AOR when Daimler determined in its "sole discretion" that such addition was "warranted." When Daimler exercised its discretion to appoint a new dealer in RITC's AOR, RITC sued Daimler for breaching both (1) the terms of the Dealer Agreement, and (2) the implied covenant of good faith and fair dealing under Rhode Island law. The district court granted summary judgment in Daimler's favor on each claim. For the following reasons, we affirm.

## I.

We describe the summary judgment record, which includes the Dealer Agreement, internal Daimler documents, the parties' statements of fact, and deposition excerpts submitted by the parties. We view the facts and take reasonable inferences from those facts "in the light most flattering to the party against whom summary judgment was entered," namely, RITC. Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 730 (1st Cir. 2022). In applying that standard, "we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight

- 2 -

of the evidence." Williams v. Kawasaki Motors Corp., U.S.A., 30 F.4th 66, 70 (1st Cir. 2022) (quoting Hochen v. Bobst Grp., Inc., 290 F.3d 446, 453 (1st Cir. 2002)).

RITC, a dealership located in Rhode Island, sells and services trucks manufactured by Daimler. RITC and Daimler entered a Dealer Agreement in February 2019, which granted RITC the "nonexclusive right" to sell and service Daimler's Freightliner brand of trucks in an AOR covering Bristol County in Massachusetts and Bristol, Kent, Newport, Providence, and Washington Counties in Rhode Island.[1] The Dealer Agreement further specified that:

> [RITC] understands [Daimler] may alter [RITC]'s Area of Responsibility at any time by providing a revised Area of Responsibility Addendum to [RITC]. [RITC] and [Daimler] understand and agree that additional authorized Freightliner Trucks dealers may be appointed in or near the Area of Responsibility of [RITC] when [Daimler], in the exercise of its sole discretion, determines that such new dealers are warranted.

In June 2021, Daimler appointed ATG Raynham ("ATGR") -- an affiliate of third-party dealer group Advantage Truck Group, LLC ("ATG") -- as a new dealer in Bristol County. William Hoelscher, Daimler's Business Development Manager responsible for New England, testified that when determining

---

[1] Unless otherwise noted, all subsequent references to "Bristol County" in this opinion refer to Bristol County, Massachusetts.

whether a new dealer in an AOR is "warranted," Daimler focuses on "the need for customer support," considering factors like its "existing dealer map," data concerning the "demand for service" and how "existing dealers" are "covering" the area "by number of [bays], techs, [and] locations," employee observations in the field regarding customer need, and existing dealer "performance" and "ability to sell parts or service vehicles in [the] AOR." With respect to the AOR in Bristol County, Hoelscher testified that Daimler's "biggest consideration[s]" were (1) the "existing dealers there," including RITC, which Daimler viewed as not "performing dealer[s]," and (2) "field input as to the need" for more customer support. He also testified that prior to appointing ATGR, Daimler had internal discussions regarding RITC's poor "[p]erformance" because RITC "[was]n't selling everything . . . that [it] w[as] allocated," had made no "progress on training," and had "continued turnover." Despite ATGR's appointment, however, RITC retained its nonexclusive right to sell Freightliner trucks in Bristol County.

As early as 2016, the same year that RITC opened for business, Daimler's senior leadership approved the formation of ATG as part of a merger of two dealer owner groups and authorized ATG to open new dealerships in Raynham, Massachusetts and Seabrook, New Hampshire -- both in territories assigned to existing dealers. Daimler later denied RITC's request to add another Daimler brand

- 4 -

of trucks, Western Star, to its franchise. According to internal emails, Daimler had "inquired about [RITC's] performance" with the Freightliner trucks and "ha[d] serious concerns about [RITC's] plans and d[id] not see how [those plans] fit into [Daimler's] consolidation plans."

In January 2018, Daimler employees prepared a draft presentation to Daimler's operating committee that outlined a strategy to consolidate forty dealer territories in the Northeast into ten owner groups. The presentation identified ATG as the consolidating dealer for New England and proposed to "dual" assign ATG in RITC's AOR in Bristol County, and then "approach" RITC with a proposal for its divestiture. The accompanying talking points noted a "need to establish ATG as [an] anchor" dealer through an "aggressive" and "unprecedented" approach but disclaimed a need to "punish" or "surprise" the divested dealers. Russell Nielsen, Daimler's corporate designee, testified that, under the consolidation plan, Daimler would "bring in" other dealers to "buyout the underperforming dealers" who "were not able to improve" and "did not want to improve." He explained that the goal was to "improve" operations in the Northeast and that "[c]onsolidation" of dealers "was a byproduct" of this strategy. In line with this plan, ATG expanded into existing dealers' territories in Massachusetts and New Hampshire and developed plans to acquire other dealers, including RITC.

Daimler's executives, including Hoelscher, met with RITC's leadership, including majority owner Sean Bachrodt, in May 2019. At that meeting, Daimler's executives rejected RITC's request to relocate to Seekonk in Bristol County. They instead suggested that RITC move "further west" and also offered to broker a sale of RITC, which RITC declined. Hoelscher's account of the meeting, however, varied from Bachrodt's: While Hoelscher testified that one purpose of the meeting "was to talk about [RITC's] performance that was poor," Bachrodt testified that he did not recall Daimler providing "any reasons" for denying RITC's request to relocate to Bristol County.

Later that fall, Hoelscher informed Bachrodt that ATGR planned to open a new Western Star dealership in Bristol County. According to Bachrodt, Hoelscher denied that ATGR would operate a Freightliner dealership there. After the discussion, RITC renovated its facility and expanded to a new facility in East Providence to increase its operating capacity. Just a few months after RITC completed that expansion, in 2021, ATGR opened a full-service Freightliner and Western Star dealer in Bristol County.

In January 2023, RITC filed a complaint in district court, alleging that Daimler's appointment of ATGR breached the Dealer Agreement and the implied covenant of good faith and fair

dealing.[2]  The district court granted summary judgment in Daimler's favor as to both claims.  This appeal followed.

## II.

"We review a grant of summary judgment de novo, examining the record in the light most favorable to the non-moving party." Nightingale v. Nat'l Grid USA Serv. Co., 107 F.4th 1, 5 (1st Cir. 2024).  "Summary judgment is appropriate if there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law."  Id.; see Fed. R. Civ. P. 56(c).

---

[2]  Prior to this suit, RITC brought a protest before the Rhode Island Dealer Board, alleging, as relevant to the ensuing appeal, that Daimler failed to provide statutory notice before appointing ATGR as a Freightliner dealer and denied RITC's Western Star application in bad faith.  The Board dismissed the protest in June 2022, concluding that it would violate the dormant Commerce Clause by applying Rhode Island law extraterritorially to conduct that occurred in Massachusetts.  RITC sought reversal of the Board's decision in Rhode Island Superior Court.  Daimler removed the case to federal district court and filed a motion to dismiss, which the court treated as a motion for summary judgment and granted.  R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC, 642 F. Supp. 3d 218, 219 n.1, 220 (D.R.I. Oct. 24, 2022).  The First Circuit affirmed summary judgment as to the Western Star bad faith claim and, with respect to the other claim, certified a statutory question to the Rhode Island Supreme Court.  R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC, 92 F.4th 330, 355 (1st Cir. 2024); see R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC, 338 A.3d 1056 (R.I. 2025) (holding that the phrase "relevant market area" can extend outside Rhode Island's borders).  Based on the Rhode Island Supreme Court's answer to that question, the First Circuit held that enforcing the state notification law would violate the Dormant Commerce Clause and affirmed the district court's grant of summary judgment to Daimler as to the statutory-notice claim.  R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC, No. 22-1913, 2026 WL 1948541, at *11-12 (1st Cir. July 6, 2026).

- 7 -

RITC challenges the district court's grant of summary judgment as to both its breach of contract and implied covenant claims.

## A.    Breach of Contract

Before determining whether Daimler breached the Dealer Agreement, we must interpret its terms.  Applying Rhode Island law,[3] we view the Dealer Agreement "in its entirety" and assign its terms "their plain and ordinary meanings."  Clean Harbors Env't Servs., Inc. v. 96-108 Pine St. LLC, 286 A.3d 838, 847 (R.I. 2023) (quoting Am. Condo. Ass'n, Inc. v. Mardo, 140 A.3d 106, 113 (R.I. 2016)).  "Where the language of a contract is clear and unambiguous, the Rhode Island Supreme Court has generally interpreted the parties' intent based solely on the written words." N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 72 (1st Cir. 2009) (quoting In re Newport Plaza Assocs., L.P., 985 F.2d 640, 645 (1st Cir. 1993)).  We will "refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity into" the Dealer Agreement.  Clean Harbors, 286 A.3d at

---

[3]    The Dealer Agreement indicates that it "has been made in and shall be construed and interpreted according to the laws of the state in which [RITC] is located."  We agree that Rhode Island law governs our interpretation of the Dealer Agreement.  See U.S. Fire Ins. Co. v. Peterson's Oil Serv., Inc., 155 F.4th 22, 28 (1st Cir. 2025) (applying Massachusetts law to interpretive questions where parties reasonably agreed it governed); Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (explaining that where "the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement").

847 (quoting Mardo, 140 A.3d at 113). A contractual term is ambiguous only "when it is 'reasonably and clearly susceptible to more than one rational interpretation.'" Id. (quoting Botelho v. City of Pawtucket Sch. Dep't, 130 A.3d 172, 176 (R.I. 2016)).

Relevant here, the Dealer Agreement's Appointment Provision provides that "additional authorized Freightliner Trucks dealers may be appointed in or near the Area of Responsibility of [RITC] when [Daimler], in the exercise of its sole discretion, determines that such new dealers are warranted" (emphasis added). Looking to dictionary definitions, the district court concluded that the Appointment Provision unambiguously "allowed Daimler to appoint a new Freightliner dealer in RITC's AOR when Daimler, in its individual choice or judgment, decided there were grounds for a new dealer." RITC takes a narrower view: it argues that, taken in the context of the Dealer Agreement as a whole, the term "warranted" requires a justification that specifically "aris[es] from market conditions within the dealer's territory." RITC insists that because "[e]very material provision in" the "Appointment" section "concerns geography, market territory, or the dealer's ability to sell within that defined area, . . . the most natural reading of . . . 'warranted' is that the justification for any such appointment must be tethered to conditions within that area of responsibility."

We conclude that, under the plain language of the contract, Daimler is entitled to judgment as a matter of law. We look to the "plain and ordinary meanings" of the terms "sole discretion" and "warranted." See Clean Harbors, 286 A.3d at 847. "[D]iscretion" is defined as "individual choice or judgment." Discretion, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/discretion [https://perma.cc/Y63T-XQS4] (last visited July 6, 2026). To "warrant" means to "serve as or give adequate ground or reason for" something. Warrant, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/warranted [https://perma.cc/UWL3-S5E3] (last visited July 6, 2026). RITC is right that although the Dealer Agreement confers "sole discretion" to Daimler to appoint a new dealer in RITC's AOR, thereby leaving the decision to Daimler's "individual choice," Daimler must still determine that such an appointment is "warranted" under the Dealer Agreement -- meaning that Daimler must have a reason for the decision. Id. Allowing Daimler to appoint a new dealer for no reason at all would render the term "warranted" superfluous. See Petrolex II LLC v. Bailey Grp. LLC, 290 A.3d 1288, 1293 (R.I. 2023) ("When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status

- 10 -

of surplusage should be rejected." (quoting Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004))).

The "warranted" requirement, however, is not overly burdensome. Although the Appointment Provision does not expressly delineate the reasons that a new dealer may be "warranted," we construe the term "in the context of the [Dealer Agreement] as a whole." Point Judith Marina, 579 F.3d at 72 (quoting In re Newport, 985 F.2d at 646). In doing so, we conclude that the reasons that may support a "warranted" determination are broader than RITC suggests. The "Introduction" section of the Dealer Agreement states that the purpose of Daimler's contracts with its dealers is to "establish[] a nationwide network of authorized Freightliner Trucks Dealers to sell and service" its products; it goes on to state that Daimler selects dealers based on their "experience" and "commitment" to "sell and service Freightliner Products in a manner that maximizes sales and customer satisfaction," and specifically represents that RITC "ha[s] the experience, capital, and facilities necessary to ensure that [it] meets its commitments" under the Dealer Agreement and "operate[] a best-in-class truck dealership." The section entitled "Responsibilities of Dealer" then specifies RITC's commitments under the Dealer Agreement. Those include that RITC (1) "use its best efforts to maximize the sale of Freightliner Products in" its AOR, including by "establish[ing] and maintain[ing] suitable

- 11 -

locations," "invest[ing] sufficient capital," "employ[ing] adequate, trained, and competent personnel," and "maintain[ing] a suitable inventory of Freightliner Trucks Products as may be necessary to fulfill [its] obligations" under the Dealer Agreement; (2) provide "prompt, reliable and effective service to all owners and purchasers of Freightliner Trucks Products" in its AOR, including by "establish[ing] and maintain[ing] complete service facilities" and "employ[ing] competent, trained personnel as may be necessary to fulfill [its] obligations" under the Dealer Agreement; and (3) "operate its dealership in accordance with and in fulfillment of" applicable operating requirements. Considering the Dealer Agreement as a whole, Daimler's reason for appointing a new dealer in RITC's AOR must relate to these contractual objectives and representations.

RITC's restrictive reading of the Appointments Provision -- namely, that any reason for appointing a new dealer must "aris[e] from market conditions" within its AOR -- does not follow from the contractual language; nothing in that section conditions dealer rights on market conditions. Once "warranted" is read to require Daimler to have a reason related to the Dealer Agreement's objectives and representations, the term is given meaning and effect, and the anti-surplusage concern is satisfied. Rhode Island law does not permit us to use the anti-surplusage canon to add into the Dealer Agreement RITC's proposed limitation

that Daimler's reason must arise from a territorial market conditions analysis. Cf. JPL Livery Servs., Inc. v. R.I. Dep't of Admin., 88 A.3d 1134, 1143-44 (R.I. 2014). Under its contract with RITC, then, Daimler had to have a reason for appointing a new dealer, but it did not have to undertake the particular territorial market conditions analysis that RITC now urges.

With this construction of the Dealer Agreement in mind, we turn to the issue of breach. RITC argues that a genuine dispute of material fact exists as to whether Daimler breached the Dealer Agreement because "a jury could find that . . . consolidation was the driving force behind ATGR's appointment" or that "Daimler made no 'warranted' determination at all." We disagree.

The evidence shows that Daimler determined that a new dealer was "warranted" for business reasons consistent with the Dealer Agreement. Hoelscher testified that as a general matter, when determining whether a new dealer is "warranted" in an AOR, Daimler focuses on "the need for customer support" based on data and employee observations regarding the "demand for service" and how "existing dealers" are currently performing in that AOR. As for the AOR covering Bristol County, he testified that Daimler's "biggest consideration[s]" were (1) the "existing dealers there," including RITC, and that none of those dealers "w[ere] a performing dealer," and (2) "field input as to the need" for more customer support. Daimler specifically had internal discussions regarding

RITC's poor "[p]erformance" because RITC "[was]n't selling everything . . . that [it] w[as] allocated," had made "no progress on training," and had "continued turnover." Therefore, Hoelscher's testimony supports the conclusion that Daimler -- in determining that a new dealer was warranted in Bristol County -- considered what Daimler viewed as RITC's failure to maximize sales and customer satisfaction, including in meeting its sales and service obligations under the Dealer Agreement.

RITC tries to undermine that determination by asserting that Daimler "produced no market study, traffic analysis, or written assessment of any kind to justify its appointment of ATGR." But the Dealer Agreement requires only that Daimler "determine" that a new dealer is warranted to advance its business objectives under the Dealer Agreement. It does not demand any specific type of analysis or evidence for that determination; instead, it grants Daimler "sole discretion," which necessarily affords Daimler substantial leeway in making that determination, so long as it does not violate the express or implied terms of the Dealer Agreement. See Hord Corp. v. Polymer Rsch. Corp. of Am., 275 F. Supp. 2d 229, 235-36 (D.R.I. 2003); Papudesu v. Med. Malpractice Joint Underwriting Ass'n of R.I., 18 A.3d 495, 498-99 (R.I. 2011). Daimler thus did not need to follow a specific process to reach, or provide studies to support, its determination.

RITC also challenges Daimler's reliance on Hoelscher's testimony concerning its poor performance, suggesting that "[a] reasonable jury could discredit" it "as an after-the-fact justification" for appointing ATGR. RITC reasons that (1) no contemporaneous documents corroborate Daimler's concerns regarding RITC's performance, and (2) Hoelscher's testimony contradicts Bachrodt's testimony that RITC's performance was not discussed at the May 2019 meeting with RITC's dealer principal. But this does not get RITC very far; the testimony cited by RITC does not evidence an improper reason for ATGR's appointment.[4]

RITC does point to internal records from as early as 2018 showing Daimler's plan to consolidate its network and suggests that RITC's divestiture was a "foregone conclusion." But there is no evidence suggesting that Daimler's consolidation plan does not itself reflect Daimler's conclusion that introduction of a new dealer in RITC's AOR was "warranted" under the Dealer Agreement. Indeed, RITC itself describes Daimler's consolidation plan as focused on "efficiency, streamlining operations, and optimizing resources" across its network. And the plan accords with Daimler's

---

[4] RITC suggests that "Daimler's Rule 30(b)(6) designee contradicted Hoelscher's account by testifying that it was feedback from the field about a Boston area Freightliner dealer's inability to serve the south Boston market, not RITC's performance, that led to ATGR's appointment." Even so, that would constitute a legitimate business objective permitting a new appointment under the Dealer Agreement.

stated concerns regarding RITC's performance. Daimler's corporate designee testified that "[t]he plan was developed by identifying underperforming dealers" like RITC. Daimler sought to "bring in" other dealers so that they could "buyout the[se] underperforming dealers" who "were not able to improve" and "did not want to improve." Consolidation was a "by-product" of this "strategy to improve the [N]ortheast." Those internal documents, even viewed in RITC's favor, do not create a genuine dispute of material fact.

Reviewing the record as a whole, we conclude that Daimler made a "warranted" determination based on contractually proper criteria. Daimler decided to appoint ATGR in Bristol County due to what Daimler apparently viewed as RITC's unsatisfactory performance of its obligations under the Dealer Agreement. We conclude that Daimler was entitled to summary judgment on its breach of contract claim.

## B.   Implied Covenant of Good Faith and Fair Dealing

We next consider RITC's argument that Daimler breached the implied covenant of good faith and fair dealing. Under Rhode Island law, "[v]irtually every contract contains an implied covenant of good faith and fair dealing between the parties." Dovenmuehle Mortg., Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (quoting Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996)). The "implied covenant provides a safeguard so that contractual aims are satisfied and parties do not act to

- 16 -

'destroy[] or injure[] the right of the other party to receive the fruits of the contract.'" Premier Home Restoration, LLC v. Fed. Nat'l Mortg. Ass'n, 245 A.3d 745, 750 (R.I. 2021) (alterations in original) (quoting McNulty v. Chip, 116 A.3d 173, 185 (R.I. 2015)). Under the implied covenant, a party "is obligated to act in good faith," Papudesu, 18 A.3d at 499, even when the contract confers on it "a great deal of discretion," id. at 498.

RITC argues that Daimler breached the implied covenant by (1) "frustrat[ing] RITC's reasonable expectations by using its discretionary authority as a pretext to carry out a consolidation scheme . . . that would have resulted in RITC's elimination"; and (2) "act[ing] in bad faith by falsely assuring RITC that ATGR would not serve the same market" despite "knowing that RITC, in reliance on that assurance, was undertaking substantial capital investments to serve the customers in its territory." We need not decide whether, under Rhode Island law, an implied covenant claim based on an alleged misuse of contractual discretion may survive the failure of a related express breach of contract claim. See, e.g., EDC Inv., LLC v. UTGR, Inc., 275 A.3d 537, 545 (R.I. 2022) (explaining that the implied covenant "does not create an independent cause of action," but must be connected to a breach of contract claim (quoting Premier, 245 A.3d at 750)). Even assuming RITC's implied covenant claim may proceed, it fails on its own terms.

We reject RITC's contention that Daimler violated the implied covenant by "using its contractual discretion" to appoint new dealers "as a pretext" for a "predetermined consolidation outcome designed to force RITC out of its territory." As discussed above, although the summary judgment record shows that Daimler developed a plan to consolidate dealers in its network, it does not show that this plan "unfairly interfere[d] with [the Dealer Agreement's] objectives." Saccucci Auto Grp., Inc. v. Am. Honda Motor Co., 617 F.3d 14, 27 (1st Cir. 2010). To the contrary, the consolidation plan was tied to the objectives to "maximize[] sales and customer satisfaction"[5] by, at the least, seeking to optimize dealer operations across the Northeast. Moreover, it did not deprive RITC of the nonexclusive contractual right granted by the Dealer Agreement, because RITC retained its right to sell Freightliner trucks in Bristol County. Nor does the evidence show that Daimler "acted arbitrarily or in bad faith" by appointing ATGR in Bristol County. Doe v. Brown Univ., 943 F.3d 61, 70 (1st Cir. 2019). Nothing in the record indicates that Daimler simply

---

[5] RITC also argues that the district court erred in granting summary judgment on its implied covenant claim because "the objectives of the contract are at the core of the disputed facts." See A.J. Amer Agency, Inc. v. Astonish Results, LLC, CA No. 12-351 S, 2014 WL 3496964, at *33 (D.R.I. July 11, 2014). We reject that argument, too. As explained above, our interpretation of the unambiguous Dealer Agreement identifies the relevant contractual objectives as a matter of law. RITC has not identified a triable issue as to those objectives.

- 18 -

sought to divest RITC of its franchise. Although RITC relies on materials referring to RITC's possible divestiture, those materials do not permit a reasonable finding that Daimler lacked a business rationale tied to the Dealer Agreement's objectives. The record supports that Daimler viewed the consolidation plan as a means to bolster sales in areas where existing dealers had underperformed. Hoelscher testified that Daimler specifically based its decision to appoint a new dealer in Bristol County on RITC's underperformance and field input regarding the need for customer support there. Whether or not Daimler's assessment was correct, the record does not permit a reasonable finding that Daimler acted arbitrarily or in bad faith in making that assessment. On this record, Daimler "is entitled to latitude" in its "commercial judgment[]." Saccucci, 617 F.3d at 23.

Courts applying Rhode Island law have also held that where a party exercises contractual discretion in a manner consistent with fair dealing, it does not breach the implied covenant even if that exercise of discretion disadvantages the other party. See, e.g., Hord Corp., 275 F. Supp. 2d at 236; Saccucci, 617 F.3d at 21-23, 27-28. Likewise, here, Daimler fairly exercised its discretion under the Dealer Agreement to appoint a new dealer in Bristol County, even if it caused RITC to lose market share within its AOR. The parties expressly contemplated that possibility when they bestowed on RITC only a "nonexclusive" right

to operate within its AOR and conferred on Daimler "sole discretion" to determine that introduction of a new dealer into RITC's AOR was warranted.

RITC separately argues that "Daimler's false assurance to RITC that ATGR would not sell Freightliner trucks in its territory," while knowing that "RITC was about to invest millions to expand its facilities," violated the implied covenant. Even accepting this characterization of the evidence, however, RITC's claim fails as a matter of law because the implied covenant cannot impose rights and duties that are not grounded in the Dealer Agreement. See Miller v. Wells Fargo Bank, N.A., 160 A.3d 975, 980-81 (R.I. 2017) (concluding that, in the absence of a contractual obligation, "it cannot be held that [the defendant] arbitrarily or inconsistently employed its contractual obligations in violation of the covenant of good faith and fair dealing"); Antonelli, 790 A.2d at 1115 ("An implied duty presupposes that an obligation exists."). Here, the Dealer Agreement specifies Daimler's duties: to "endeavor to provide [RITC] with a fair and equitable share of [Daimler's] production of Freightliner Trucks Products"; to "make available sales and service support to [RITC] . . . as [Daimler] shall deem necessary for the needs of [RITC]"; and to "offer" RITC certain "newly introduced same branded" vehicles "intended for the same general application" as those offered under the Dealer Agreement, conditioned on RITC meeting

its own obligations. None of those duties required Daimler to give RITC information or assurances about other dealers in the network, including whether ATGR would sell Freightliner trucks in RITC's AOR. Nor has RITC shown that Daimler's alleged assurance about ATGR's future Freightliner sales was tied to Daimler's performance of any obligation under the Dealer Agreement.

Because RITC has failed to show that Daimler breached the implied covenant of good faith and fair dealing under either theory that it asserts, the district court properly granted summary judgment to Daimler.

### III.

We **affirm** the district court's grant of summary judgment on RITC's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.